## William P. Coffey, Appellee, v. William G. Sutton et al., Appellants.

### Gen. No. 5,660.

1. MASTER AND SERVANT—*right to assume usual custom will be followed.* One employed as a blacksmith about a mine, when directed to repair a stall in connection with a jumbo car, has a right to assume that the usual custom will be followed and that the car will not be pulled without warning.

2. EVIDENCE—*jury to decide controversies of fact.* Where a declaration states a cause of action and a *prima facie* case is made out, it is for the jury to decide the controversies of fact and whether the *prima facie* case thus made was rebutted.

3. APPEALS AND ERRORS—*error must be raised in lower court.* An alleged error in permitting a juror to question witnesses cannot be first raised in the appellate court.

4. MASTER AND SERVANT—*instructions.* Where the declaration excludes the defense of assumed risk, plaintiff has a right to have instructions on that theory.

5. MASTER AND SERVANT—*ignoring defense of assumed risk.* Instructions ignoring the defense of assumed risk are not erroneous where the declaration excludes such a defense.

6. DAMAGES—*cost of X-ray picture.* In a personal injury action it is error to admit testimony as to cost of an X-ray picture where it was unnecessary or not ordered by a physician.

7. DAMAGES—*remittitur of hospital bill.* In a personal injury action where the lower courts admits testimony of a hospital bill including an unnecessary X-ray picture, a remittitur is ordered.

8.  EVIDENCE—*proof of usual and customary charge.* A physician cannot testify to the amount of his bill in a personal injury action where there is no proof of the usual and customary charge.

Appeal from the Circuit Court of Woodford county; the Hon. GEORGE W. PATTON, Judge, presiding. Heard in this court at the April term, 1912. Affirmed on remittitur. Opinion filed October 15, 1912. *Certiorari* denied by Supreme Court (making opinion final).

THOMAS KENNEDY, R. M. BARNES and McDOUGALL & CHAPMAN, for appellants.

JAMES A. REILY and McMAHON & ROGERS, for appellee.

MR. JUSTICE WHITNEY delivered the opinion of the court.

This case was brought in the court below to recover damages for injuries received by appellee on October 30, 1909, while working as an employee of appellants, at their coal mine in Minonk. The case was tried on two amended counts and one additional count of the declaration. The first amended count of the declaration charges that appellants were possessed of and conducting a coal mine, and were possessed of various buildings, run-ways, tracks and cars used in connection with the mine, and located at, around or near the opening of the mine; and were possessed of a certain track or run-way, made of rails and ties, and other material, upon which track, in the course of their business they operated a certain vehicle known as a "jumbo car," used for the purpose of conveying from a point near the shaft of the mine, upon an inclined plane, certain waste material from the mine, for the purpose of dumping and depositing the same in a pile of waste material, which jumbo car was when in motion controlled and handled by means of a cable attached to machinery driven by steam power; and that appellants possessed a certain contrivance called a "stall" located at the lower end of said track, in which stall the jumbo car was loaded with waste ma-

terials from time to time; that on the thirtieth day
of October, 1909, said stall and a certain post of said
stall were out of repair, and that then, and for sev-
eral months prior thereto, appellee was in the em-
ploy of appellants as a blacksmith, wood-worker and
repairer; and that on said last mentioned day, appel-
lants ordered appellee to repair said stall and post,
and that in obedience to such order, appellee went
upon the track, with necessary tools to make such
repairs, and then with all due caution for his own
safety proceeded to repair the post, and that in making
such repairs to said post, it was necessary for appel-
lee to go upon and into said track, in front of said
jumbo car; that it became and was the duty of ap-
pellants to use reasonable care, and not to unneces-
sarily expose appellee to danger, and not to cause or
allow said jumbo car to be moved or drawn along
said track, over the place where appellee was at work,
that appellee might safely work in making such re-
pairs; that appellants did not regard their duty in
that behalf, neither of whom was a fellow-servant of
appellee, but negligently, carelessly, wilfully and wan-
tonly, while appellee was using all due care and cau-
tion for his own safety, without cautioning or warn-
ing appellee in any way, and while appellee was at
work repairing such post, and while in said track, and
in front of said jumbo car, negligently put the ma-
chinery in operation, to which said cable was attached,
and thereby caused the jumbo car to start up the in-
clined track, upon and over appellee.

The second count alleges the same possession of the
mine track, jumbo car and stall, and the employment
of appellee as a blacksmith, etc., and that said stall
was out of repair and that appellants directed appel-
lee to repair the stall, and to force back into place a
certain upright or post, which was a part of said stall.
Said count further alleges the same necessity of going
on the track, and the same duty of appellants, and that
it was the custom of appellants, and had been for

more than a year prior thereto, not to move said
jumbo car out of the stall, over the track, until the
blowing or sounding of a certain steam whistle, used
by appellants, and that such had been the custom con-
tinuously for more than a year, with all of which ap-
pellee was conversant, and all of which was known
to, and understood by all the other employees of ap-
pellants; that appellants had full knowledge that ap-
pellee knew all of said rules, and that when he started
in obedience to said order to make said repairs he
relied upon the enforcement of said rule, or custom;
that it was the duty of appellants not to permit or
cause said jumbo car to pass over said track without
causing one blast, or sound of said whistle, to warn
appellee or without first notifying him that said car
was about to move in order that appellee might get
out of and off from the track; yet, appellants not re-
garding their duty in that behalf, but while appellee
was so at work making said repairs appellant Webber
went from the place where he started to put appellee
to work to a steam engine, used by appellants in carry-
ing on their business, and without any warning, and
without the whistle being sounded, negligently, care-
lessly, wilfully and wantonly turned on the steam of
said engine, causing said jumbo car to start over said
track at a rapid rate of speed, against and over ap-
pellee, while he was at work, and in the exercise of all
due care and caution for his own safety, and thereby
appellee was injured.    The additional count alleges
possession by appellants of the same mine, track,
jumbo car, stall, machinery, etc., and that on the 30th
day of October, 1909, the northwest post of said stall
was out of repair; that appellants ordered appellee
to repair said post, and that in obedience to said or-
der, appellee went upon the track, with all due care
and caution, with the necessary tools and apparatus
to make such repairs, and proceeded to repair the
same, and in so doing it was necessary for appellee

to go upon the track in front of said jumbo car, and remain between the rails, and between the ties and track, and to stand upon a certain pile of waste material deposited underneath the track; that it became the duty of appellants to use reasonable care not to unnecessarily expose appellee to danger of injury, and not to cause or allow said jumbo car to be moved over and across the point or place where appellee was at work, that appellee might safely make such repairs; yet appellants not regarding their duty in that behalf, nor using care or diligence, they negligently, without any warning to appellee in any way, while he was at work, and while in front of said jumbo car, put the machinery in operation, and caused the jumbo car to start up the inclined track and over appellee, whereby appellee sustained injuries, which are the subject-matter of this suit. The different counts state the same negligence in different forms, to meet what might occur in evidence. A trial was had, resulting in a verdict and a judgment for $8,000, against appellants, from which they have appealed to this court.

In their brief and argument, appellants take up certain errors assigned, stating at the conclusion of their argument that, "other errors appear in the record we think, but which are not of vital importance, and we have not therefore discussed them." The errors assigned that are argued, are (1) the verdict is contrary to the weight of the evidence; (2) error in giving appellants' instructions; (3) error in modifying appellants' instructions; (4) error in refusing appellants' instructions; (5) error in admitting incompetent evidence for appellee; (6) error in excluding proper evidence offered by appellants; (7) error in permitting a juror to question one of appellants; (8) error in permitting prejudicial remarks of appellee's attorney in the argument of the case.

In order to have a better understanding of the evidence it will be necessary to make a statement at considerable length of the matters involved in the suit.

Appellants were operating a coal mine. Appellee was employed by them as a blacksmith, horseshoer and repairer. To dispose of the waste from the mine, appellants had a kind of railway, or tramway track running up from near the mine shaft, at an angle of about forty-five degrees, a distance of about seventy-five feet. The track at its lower end was built on a trestle for a few feet, and then was laid on ties embedded in a pile of waste that had accumulated. The car called a "jumbo car" ran on this track, from its lower end to the top, operated by cable and engine, to carry the waste and dump it near the top. At the lower end of the track there was a frame or rack called a "stall" into which the jumbo car entered to be loaded. The stall was made of posts about six feet apart, three on each side of the track, running in a northerly and southerly direction, mortised into ties, planking or timbers at the bottom, with rods or planking across, and on the top. There was a plank fastened to the posts on each side. The lines of the posts did not run exactly parallel, but the opening at the northerly or upper end of them was a little wider than at the southerly, or lower end, making the stall a little flaring at the northerly end. The jumbo car had doors that operated and locked automatically as the car started to enter the stall. When the car reached and had entered the stall, it was loaded usually with two pit car loads of the waste rock dumped from above through a chute, and then a signal was given by a blast from a steam whistle, which gave warning that the jumbo car was about to be pulled up the inclined track with its load. The use of this warning signal had existed so many years that all of the employees seemed to know what it meant. In the testimony of the witnesses for both sides this practically was alluded to as a custom. The stall and car occasionally required repairs. On the morning of October 30, 1909, the stall was noticed to be in need of repairs, and appellant Webber directed appellee to go and fix it.

While appellee was engaged in fixing the stall, appellant Webber pulled the jumbo car, without giving the warning whistle, up the track, and over appellee, who thereby suffered the injuries complained of. It is well to settle some matters of fact about which there is no controversy before taking up other questions that arise on this appeal, namely: Appellants were operating a coal mine with certain machinery including the jumbo car and stall above mentioned; appellee was, and had been for about a year appellants' employee as a blacksmith; appellee was injured by having the jumbo car run over him; the stall was in need of repairs; appellee was directed by appellants to fix the stall. The custom of sounding the whistle when the jumbo car was about to start with its load is testified to by both sides. Appellee and his witnesses, Grescoviak, Schiminski, Spires and Willis testify to it. Appellant Webber, and appellants' witnesses, Cox, Wadley, Kruse and W. G. Sutton, Sutherland, Joe Williams, John Lynch, Shepard, Roy R. Sutton and Kelly testify to it.

The witnesses for both sides speak of the blasts of the whistle as a custom, so it may be considered an established fact that such custom existed, and that appellee and appellants knew of its existence. It is equally clear from the proofs that no whistle was blown when the jumbo car was pulled at the time appellee was hurt. Appellants claim in defense that the custom also existed that when repairs were needed, and were being made on the stall or jumbo car, the custom of giving that warning signal was suspended, and that the repair men took charge, and when the repairs were completed the jumbo car was turned back for operation. Substantially the same witnesses for appellants testify to this custom also. If we are to be governed by appellants' proofs, we can arrive at no other conclusion than that the jumbo car was never moved at such times. The witness Cox for appellant, testified, "don't think during the five years that I

worked there in the engine room, I ever pulled jumbo, or whistled the signal while the repair men were at work on jumbo, or the stall, or the track, nor did I ever know of anybody else signaling.'' Joe Willis for appellants testified, ''when the car, stall or track were out of repair, there were no signals given with the whistle at that time. The men who were in charge of the work, always gave orders to the tower men, when they were working on the car, or the stall, not to dump any more rock. Of course, when the rock wasn't dumped, the whistle was not blown. The tower men knew when the rock was dumped, and had no occasion to blow the whistle. After it was ready for use again, all completed, it was put back in charge of the tower men. No one except those who were repairing the car, stall or track had any control over it during the time repair work was being done.'' The witness John Lynch, for appellants, testified, ''When the car, stall or track were out of order, and men were repairing it, or about to repair it, the man who was pulling the car, was notified, and the tower men were told not to dump any more rock, or to blow the whistle, until it was repaired. I worked in the engine room six years, the 4th of April next. During that time I never knew of the jumbo car being pulled, or the whistle signal given from the tower, when the men were engaged in repair work, either on jumbo, the stall, or track.'' So that the only logical conclusion is that the jumbo car was never pulled unless the whistle signal was given, whether repairs were going on or not.

Appellee was directed to go from the blacksmith shop and repair the stall, and when he commenced working thereon, he must have understood the custom of doing work around it. He had been employed there in the same line of work for a year before he was hurt, and the stall was occasionally out of repair. He had the right to assume that the usual customs would be followed, and that the jumbo car would not be pulled without warning, no matter where he stood in doing the work, whether on the track, or on the ground. Illi-

nois Steel Co. v. Ziemkowski, 220 Ill. 324; Graham v.
Mattoon City Ry. Co., 234 Ill. 483. So the case re-
volves itself into one which depends very largely on
whether he was told by appellant Webber that the
jumbo car would have to be pulled, that is, whether he
was warned in any way that the car was about to be
pulled. Webber says he told appellee "We will have
to pull this car and fix it," to which appellee replied
"all right," and that he then went away and called to
the tower men two or three times before they heard,
and told them "don't dump any more rock into jumbo;
I want to pull and fix it." This is denied by appellee.
We think the declaration negatives the question of as-
sumed risk. It alleges among other things, that ap-
pellants ordered appellee to do the work in question,
and acting under those orders, appellee proceeded to
do the work, and that appellants, without any warn-
ing ran the jumbo car over him. There is nothing in
appellees proofs that shows appellee was proceeding
to make the repairs in question in a careless or negli-
gent manner. There is no question of fellow-servant
in this case. We hold that each count of the declara-
tion stated a cause of action, and that appellee made
a *prima facie* case. Corn Product Refining Co. v.
Cherry, 140 Ill. App. 1. Whether appellants rebutted
the *prima facie* case thus made by the evidence offered
by them, and controversies over the question of fact,
were all questions to be passed upon by the jury, who
saw and heard the witnesses. There is a controversy
as to what was said by appellant Webber to appellee
when they first arrived at the place where the repairs
were to be made, Webber testifying he said to appel-
lee, "We will have to pull this car and fix it," and then
going to the tower and calling to the tower men not
to dump any more rock into jumbo, that he wanted
to fix it. One of appellants witnesses testifies sub-
stantially to the same thing; while appellee denies that
Webber said to him "we will have to pull jumbo and
fix it." A witness for appellee testified that what

Webber said to the tower men was, ''Don't dump any more rock into jumbo until it is fixed.'' The evidence shows that at that time the machinery was in motion, and making a great deal of noise. Webber testifies he had to call two or three times before he made himself heard. There is also a dispute as to which post on the stall was to be repaired; appellee testifying it was the northwest post, in which he was corroborated by one of his witnesses, who testified that he saw him working at the northwest post; while appellant Webber, and several of appellants witnesses say it was the middle post on the west side. There is a further controversy as to where was the proper place to stand while making repairs, whether on the track, or on the ground west of the track; appellee's witnesses saying it was the northwest post, and that if appellee stood on the ground opposite the post, the bottom of it would be as high as his head; while appellant Webber, and some of appellants' witnesses testify it was the middle post, and that it could not be repaired without moving the jumbo car, and that the proper place to stand while fixing it would have been, not on the track, but on the ground to the west. There is also evidence given for appellee by the witness Grescoviak that Webber said, when he was informed that appellee had been run over, ''My God, what have I done,'' and by the witness Dixon, that he was at work for appellants and saw appellee immediately after he was hurt, and that he saw appellant Webber walking past, and then heard him make a remark; that he must have made the remark to himself, but that witness overheard it; that Webber was looking toward the ground, and that he snapped his fingers and said, ''Doggone it, but I forgot he was there,'' all of which is denied by Webber, who testified that he said ''My God, Coffey, how did you get hurt?'' Impeaching evidence of two witnesses was offered as to the witness Dixon, to the effect that Dixon said he hoped Sutton and Webber of the Minonk Coal Company would get stuck for fifty thousand dol-

lars, and that he would do all he could to help stick them. There was also evidence introduced by appellants that appellee said he did not know how he got hurt, and that no one was to blame, and this is sharply denied on the other side. The evidence as to all these controverted points was sharply conflicting, and it was all for the jury to determine where the truth was. They had the advantage of seeing the witnesses, and hearing their testimony. Many of the witnesses were employees of appellants. The jury undoubtedly weighed the testimony of each witness as it was given, and it was their privilege and duty so to do. We are unable to say where the truth is from this record, and therefore cannot say that the verdict is not supported by the weight of the evidence.

It is argued that the damages are excessive. Under the evidence we do not think the verdict should be disturbed on that account. The rulings upon evidence in the trial court are not seriously objectionable, and we see no reversible error therein, except in the following instances. Dr. Morrison was permitted to testify to the amount of his bill for services for attendance on appellee, after he had testified he did not know the usual and customary charges of surgeons in such cases, and that his bill was seventy-five dollars. No other proof appears that the charge was the usual and customary charge for such services as were rendered by Dr. Morrison. The evidence allowed the jury to take the amount of seventy-five dollars into consideration in making up their verdict. The admission of this evidence was error. Moore v. Aurora, E. & C. R. Co., 150 Ill. App. 484.

Appellee was permitted to testify over appellants' objection that he paid $104.00 for an X-ray picture, and hospital fees to St. Anthony's hospital in Chicago. There is no proof that the X-ray picture paid for was ordered by a physician or surgeon, or that it was necessary to appellee's treatment in any way, and although Dr. Clancey testified to having taken an X-ray

picture of appellee's arm there is no proof that it was the same one paid for to the hospital. Indeed the testimony of Dr. Clancey is that more than one X-ray picture was taken. Appellee paid for one, but which one, cannot be determined from the evidence. There is no evidence of how much the X-ray picture came to, or how much the hospital fees were. If the hospital fees could be determined, that would be competent evidence. We think the admission of this evidence was also error.

Appellee must remit the amount of $179 or the judgment must be reversed on account of the admission of this incompetent evidence.

The error alleged in permitting a juror to interrogate the witness Webber is not based on any objection made at the trial. It was not specifically mentioned in the motion for a new trial, and cannot now be urged here for the first time. The arguments of counsel are largely within the control and discretion of the trial court. We cannot see that the trial court abused the discretion it had in that regard. Complaint is made of many of the instructions given, modified, or refused. We cannot refrain from condemning the unusual number thereof. More than sixty instructions, many of them of great length, were handed up to the court for him to pass on, presumably at the usual time, at the close of all the evidence, requiring the court to pass upon them during the argument of counsel. The thing to be wondered at is, that they were passed upon with so little error, if any. In the main, the instructions as given, are substantial statements of the law as applied to the evidence given on the trial. Certain of appellee's instructions directed a verdict without a statement of the law of assumed risk, and it is contended that such are erroneous because of that omission. Each count of the declaration excludes the defense of assumed risk as we have herein above held, and that being so, appellee had the right to have the jury instructed on that theory.

Hagen v. Schleuter, 236 Ill. 467. In many respects the criticised instructions have been ruled upon favorably by the Supreme Court. A number of the refused instructions are general propositions of law, not applied to the case, which it is never error to refuse, although frequently not error to give. Many of the refused instructions are embodied in those given; others contain some erroneous element, or some assumption of a different state of the evidence from that shown by the record. The jury was instructed by the 10th of appellee's instructions that the instructions given constitute one connected body or series, and should be so regarded by them. If they so looked at them, they would not have been misled as to the law of the case. We have gone over the instructions given, modified and given, and refused *seriatim,* with more than ordinary care, and have read with great care the somewhat voluminous arguments of both parties, and it is thought we have a thorough understanding of them. Appellants had given, and modified and given for them, some twenty-eight or twenty-nine instructions, which with appellee's instructions, when considered as a series, cover nearly every phase and angle of the law applicable to the case and we believe the jury were fully and fairly instructed. We do not see how the refusal of instructions operated to the prejudice of appellants' rights. It may be said that the substance of each and all of the refused instructions was embodied in those given, either for appellee or appellants. We think the first instruction is not subject to the criticism that it did not limit the negligence to that alleged in the declaration. The first instruction is not objectionable because it ignores the defense of assumed risk. As is said in the case of Hagen v. Schleuter, 236 Ill. 467: "A party to a suit is entitled to have instructions given presenting his theory of the case, based upon the pleadings and proof. If the opposite party relies upon a different theory repugnant to that of his adversary, it is for him to ask for in-

structions presenting his theory of the case." And again, in Devaney v. Otis Elevator Co., 251 Ill. 28, the Supreme Court says "that the objection that the instructions for plaintiff did not negative assumed risk, is only available where some affirmative defense is not negatived by the averments of the declaration." We think under the evidence, the second instruction was properly given. That instruction does not state any assumption of negligence, nor for the reasons above stated is the criticism proper that it ignores the question of assumed risk. Under the evidence, it was proper to instruct the jury as was done by plaintiff's third instruction concerning the employment of doctors and surgeons. The fourth instruction required the plaintiff not only to be in the exercise of due care for his own safety at the time he was working between the rails, but it required him to be in the exercise of ordinary care at the time he was injured. We think that instruction was properly given. The words "due care," in that instruction, and ordinary care mean one and the same thing. The fifth, sixth and eighth instructions we deem were properly given. The doctrine stated in the 13th instruction was approved by the Supreme Court in the case of South Chicago City Ry. Co. v. McDonald, 196 Ill. 203. That instruction told the jury they were the sole judges of the questions of fact in the case, and that the court did not, by any instruction given to the jury in the case, intend to instruct the jury as to what conclusion they should arrive at, as to any question, or questions of fact in the case. It seems to be taken almost literally from South Chicago City Ry. Co. v. McDonald, *supra.*

The 15th instruction as is stated in appellee's brief was approved verbatim in the Supreme Court in the case of Eblin v. American Car & Foundry Co., 238 Ill. 176. The 18th instruction is not as strong as it might have been and still be the law. Appellants' modified instruction No. 40 was a correct statement of the law.

as applied to the declaration in the case.   In Mitchell
v. Libby, McNeill & Libby, 149 Ill. App. 201, the court
decided that "due care," "ordinary care," and "rea-
sonable care," are convertible terms; therefore we see
no error in the modification of the 43rd instruction.
The 49th instruction given of the court's own motion,
is substantially the same as the 54th instruction which
was refused, and there was no error in the court giv-
ing that or in refusing the 54th.   The modification of
the 46th instruction is also criticised, and we agree
with appellee it should not have been given at all.
It was not based on the evidence, or any fair theory of
the evidence.   The 47th instruction was modified the
same as the 46th, and what is said in regard to the
46th instruction applies with equal force to the 47th.
Appellants' instruction No. 50, which was refused, is
an abstract proposition of law, not applied to the case,
and could properly be refused for that reason, but the
substance of it is embodied in the instructions given
for appellants, Nos. 47, 48 and 32, as were also appel-
lants instructions Nos. 51 and 52, which were refused.
The 53rd instruction was properly refused because
only the additional count of the declaration referred
to the northwest post of the stall.   By instruction No.
37 given, appellants had the benefit of all they were
entitled to.   The 55th instruction refused was a mere
abstract proposition of law.   The substance of the 56th
instruction refused was contained in the 24th, 33rd,
34th, 35th, 36th, 42nd and 43rd instructions given.
The 57th and 58th instructions were embodied in sub-
stance in the 32nd, 47th and 48th instructions, which
were given.   We do not regard the record as showing
evidence on which to base the 59th refused instruction.
The 60th instruction refused was embodied in the 27th,
which was given.   The 61st instruction was practically
embodied in the 46th, 47th and 48th instructions given.

Upon the filing of a remittitur, within five days, in
the sum of $179.00 the judgment of the lower court

will be affirmed in the sum of $7,821.00 at appellee's costs. If said remittitur is not filed within said five days, the judgment of the court below will be reversed.

*Affirmed upon remittitur.*

Appellee having filed a remittitur herein in the sum of $179.00 the judgment is therefore affirmed in the sum of $7,821.00 at the costs of appellee.